IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAXIDE ACQUISITION, INC., et al.,[1] | ) Case No. 05-_10429_ (___) |
| | ) (Jointly Administered) |
| Debtors. | ) |

## AFFIDAVIT OF ROBERT BAXTER, EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER IN SUPPORT OF FIRST DAY MOTIONS FILED CONTEMPORANEOUSLY HEREWITH

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ss) |
| COUNTY OF NEW CASTLE | ) |

Robert Baxter declares as follows:

1.      I am the Executive Vice President, Chief Operating Officer and Chief

Financial Officer of each of the following entities:  Maxide Acquisition, Inc., a Delaware

corporation ("Maxide"); AEI Music Network, Inc., a Washington corporation ("AEI"); DMX

Music, Inc., a Delaware corporation ("DMX Music"); and Tempo Sound, Inc., an Oklahoma

corporation ("Tempo"), (hereafter referred to collectively as the "Debtors").[2]

2.      I have served in an officer capacity for the Debtors since October, 2001.

3.      My current duties for the Debtors include general supervision of and

responsibility for the finances, property and business of the Debtors; assisting with the Debtors'

---

[1] The Debtors consist of the following entities: Maxide Acquisition, Inc., a Delaware corporation; AEI Music Network, Inc., a Washington corporation; DMX Music, Inc., a Delaware corporation; and TEMPO Sound, Inc., an Oklahoma corporation

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them as relevant in the Application or Motion wherein such term is found.

business plans and strategies; advising and assisting the Debtors' directors and officers with respect to the business and financial activities of the Debtors, and other related matters.

4.     In my capacities with the Debtors, I am and have been actively involved in the Debtors' efforts to sell their businesses and finances with the assistance of other employees of the Debtors, legal counsel, and financial consultants. Additionally, I have general knowledge of the Debtors' books and records, and I am familiar with the Debtors' financial and operational affairs.

5.     I submit this Affidavit in support of the "first day" motions (described further below) (collectively, the "First Day Motions") of the Debtors. Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my opinion based on my experience with the Debtors' operations and financial conditions. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Affidavit on behalf of the Debtors.

6.     Based on my personal knowledge, and through my review of the Debtors' books, records and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession

during the course of their respective bankruptcy cases pending a sale of substantially all of the Debtors' assets.

7.     Part I of this Affidavit describes the business of the Debtors and the developments that led to the filing of their chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtors concurrently herewith. Capitalized terms not defined herein have the same meanings ascribed to them in the First Day Motions.

## PART I

### Background

8.     On the date hereof (the "Petition Date"), the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases (the "Chapter 11 Cases").

### Description of the Debtors' Business

9.     Maxide is a holding company which owns 100% of the stock of AEI, DMX, and Tempo. Maxide was formed to facilitate a merger between AEI and DMX Music, in 2001 (the "DMX Music Merger"), and holds a significant portion of the Debtors' collective debt obligations. DMX Music owns all of the Debtors domestic operating assets and liabilities. DMX Music also owns directly or indirectly, the stock of various foreign corporations. Tempo has no assets.

10.     Maxide is owned 56% by Liberty Digital, Inc. ("Liberty Digital"), 37% by Michael Malone (the current Chairman of DMX Music and a former AEI shareholder prior to the DMX Music Merger), and the remaining 7% by various other parties.

11.     Debtors, through their direct and indirect foreign subsidiaries (the "Foreign Affiliates"), do business in six continents and over 100 countries, while servicing more than 160,000 business locations, approximately 6 million consumer subscribers, and 30 commercial airlines. The Debtors and their Foreign Affiliates have approximately 860 employees, 575 of whom are based in the United States and working in approximately 12 locations domestically.

12.     Debtors, together with their Foreign Affiliates, are the leading global providers of music and entertainment subscription services to business locations, consumer subscribers, and airlines. Debtors and their Foreign Affiliates offer their customers a wide array of media and entertainment services, including music, music videos, visual imaging, message marketing, CD compilations, and other services. In addition to these services, the Debtors provide sound and video systems engineering and consulting, proprietary delivery platforms, third-party systems equipment, installation, and other sound and video contracting services.

13.     Debtors operate two divisions ("Commercial" and "Consumer"). The Commercial division provides music, entertainment, equipment and other services to over 160,000 business locations and 30 major commercial airlines. The Consumer division provides individual consumers with in-home commercial free music through digital cable, DBS satellite or broadband networks.

14.    Debtors' consolidated revenues for their Consumer and Commercial divisions, amounted to an aggregate total of $107.7 and $109.4 million, for the fiscal years ending 2003, and 2002 respectively.   The Debtors also produce revenue from the sale of proprietary platforms, third-party audio and video equipment, and installation services (the "Sale Business").  The consolidated revenues of the Sale Business were $73.5 million in 2003 and $68.2 million in 2002.

15.    The Debtors' business operations resulted in total consolidated revenues of approximately $181.2 million in 2003, and $177.6 million for 2002.

16.    For the fiscal year ending December 31, 2004, Debtors had estimated revenue of $186 million, an estimated operating loss of $13.2 million and an estimated net loss of $18.9 million.

### Historical Background

17.    AEI was founded in 1971.  AEI became the first music service to license and program original artist music for delivery to large global commercial customers.  AEI possessed a strong presence in the international markets.  DMX Music was founded in 1986. Like AEI, DMX Music licensed and programmed original artist music, but with an emphasis on delivery to the domestic consumer market and small to medium domestic commercial customers. Following a series of acquisitions, alliances, and expansions, DMX Music became a wholly-owned subsidiary of Liberty Digital.

18.    In 2000, DMX Music and AEI announced their intention to merge.  The DMX Music Merger was completed in May 2001. The strategic rationale of the DMX Music Merger was to combine AEI's strong national commercial accounts and international

commercial operations with DMX Music's domestic consumer and domestic local commercial customers.

19.     Pursuant to the DMX Music Merger, title to all of AEI's assets was transferred to DMX Music. DMX Music Merger has operated the business of the consolidated Debtors (with the assistance of executive management support by Maxide) at all times subsequent to the DMX Music Merger.

### The Debtors' Principal Indebtedness

20.     The DMX Music Merger was financed primarily through a credit facility to Maxide provided by a bank group agented by Royal Bank of Canada ("Royal Bank" or the "Agent"), on behalf of itself and various other financial institutions (collectively, the "Prepetition Secured Lenders"). The Debtors ultimately received the net loan proceeds, and the outstanding principal balance owed to the Agent and the Prepetition Secured Lenders (exclusive of the Liberty Digital/Bank Debt discussed below) is approximately $86 million (subject to such exclusion, the "Royal Bank Obligations" and together with the Liberty Digital/Bank Debt, the "Royal Bank Facility"). Each of DMX Music, AEI, and Tempo are guarantors of the Royal Bank Obligations.

21.     The portion of the Royal Bank Facility consisting of the Royal Bank Obligations is comprised of a revolving line of credit (the "Revolving Loan") and certain term loans (the "Term Loans"). The Term Loans are in the original principal amount of $90 million. As of the Petition Date, the Royal Bank Obligations consisted of the Revolving Loan balance of approximately $11 million and the Term Loans balance of $75 million.

22.     The Royal Bank Obligations are secured by substantially all of each Debtor's assets (other than a minority interest in DMX Music's equity interest in its foreign subsidiaries (the "Excluded Equity")) (the "Royal Bank Lien").

23.     Liberty Digital holds a "last out" portion of the Royal Bank Facility equal to $35 million in principal plus approximately $7 million of accrued pre-petition interest (the "Liberty Digital/Bank Debt"), which is contractually subordinated to the payment in full of the Royal Bank Obligations. By its express terms, the Liberty Digital/Bank Debt is not secured by the Royal Bank Lien.[3]

24.     The Debtors' other indebtedness consists of unsecured debt (at the Maxide level) held by Liberty and the former AEI shareholders of approximately $41 million.

25.     Debtors also have unpaid trade obligations as of the Petition Date of approximately $13 million.

26.     Certain of the Prepetition Secured Lenders (in this capacity, the "DIP Lenders") are providing debtor in possession financing (the "DIP Loan") to the Debtors. The agent in respect to the DIP Loan is again Royal Bank (in this capacity, the "DIP Agent").

**Need for Bankruptcy Relief –
Causes of the Debtors' Business Decline**

27.     As a result of various unanticipated operational and market factors the Debtors suffered significant financial reversals beginning in 2002. Specifically, in 2002, Debtors reported $108.3 million in operating losses, including a one-time charge of $81.5 million as "goodwill impairment."

---

[3] The Liberty Digital/Bank Debt is not included in the $86 million in Royal Bank Obligations described in paragraph 15 above.

28.     2003 showed a marked improvement in terms of reduced operating losses. The Debtors' revenues in 2002 were approximately $177.6 million compared to $285.9 million in operating expenses for that year, while its 2003 revenues improved to $181.2 million, against $196.5 million in operating expenses.

29.     Operating performance for 2004 was again markedly improved. For the fiscal year ending December 31, 2004, Debtors had revenue of $186 million and generated operating free cash flow of approximately $6 million.

30.     As indicated, Debtors are now operating on a cash positive basis. Nonetheless, Debtors do not have the ability to service or satisfy the Royal Bank Obligations or the other claims asserted against them. Debtors therefore determined that a "going concern" sale of their assets was necessary.

### Specific Reasons for the Bankruptcy Filing - The Proposed Sale Transaction

31.     Debtors therefore have been actively marketing their business (including the equity in their Foreign Affiliates) for sale, and have been approached by several strategic and financial buyers who are interested in purchasing the Debtors' assets.

32.     The best offer for the Purchased Assets was presented by Trinity Hunt Partners III, L.P. and Capstar Partners, LLC (collectively, "Capstar"). The terms of Capstar's offer are generally as follows: (a) Capstar will establish a newly formed entity, THP Capstar, Inc., as the stalking horse "Purchaser"; and (b) the Purchaser will acquire all of the operating assets of the Debtors and DMX Music's equity interests in its Foreign Affiliates (collectively, the

"Purchased Assets") free and clear of liens under Bankruptcy Code § 363 for a purchase price of approximately $75 million, subject to various holdbacks and working capital adjustments.

33.     The Prepetition Secured Lenders are potentially facing a significant loss, given the terms of the Purchase Offer, as contrasted with the $86 million in Royal Bank Obligations. The Prepetition Secured Lenders are nonetheless supportive of an expedited auction process to sell the Purchased Assets through one or a combination of transactions, either to the Stalking Horse Purchaser pursuant to the Capstar Offer, or to whichever prospective purchaser(s) present the highest or otherwise best offer(s) at the auction to be scheduled by the Court (the Capstar Offer or such other highest or otherwise best offer, the "Successful Offer").

34.     The Debtors believe that the sale of their assets as a going concern pursuant to the Successful Offer is far preferable to a liquidation. Importantly, the consummation of a Successful Offer would preserve more than 800 jobs. In addition, the pursuit of an auction process to realize going concern value will maximize the value of the unencumbered assets of the Debtors (i.e., the Excluded Equity) and thereby afford unsecured creditors the opportunity to obtain a return on their claims.

35.     Given these obvious benefits to the estates, the Debtors' board of directors determined to file these Chapter 11 Cases (with the support of the Prepetition Secured Lenders) in order to consummate the Capstar Offer or, if applicable, another Successful Offer.

# PART II

## First Day Motions and Applications

### A. Motion for Entry for an Order Directing Joint Administration of Related Chapter 11 Cases

36. The four Debtors that filed for bankruptcy protection are related entities. I am informed by counsel that the joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in savings to the esates. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors and parties in interest.

### B. Application Pursuant to Federal Rule of Bankruptcy Procedure 2014(a) for Order Under Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. As Counsel for the Debtors and Debtors in Possession

37. By this Application, the Debtors seek to employ and retain the firm of Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. ("PSZYJ&W") as their bankruptcy counsel with regard to the filing and prosecution of their Chapter 11 Cases. Accordingly, the Debtors respectfully request the entry of an order pursuant to section 327(a) of the Bankruptcy Code authorizing them to employ and retain the PSZYJ&W, *nunc pro tunc* to the Petition Date, as their attorneys under a general retainer to perform the legal services that will be necessary during these Chapter 11 Cases.

38. The Debtors seeks to retain PSZYJ&W as their counsel because of PSZYJ&W's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and because of the Firm's

expertise, experience and knowledge practicing before this Court. In preparing for its representation of the Debtors in this case, PSZYJ&W has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these Chapter 11 Cases. Accordingly, I believe that PSZYJ&W is both well-qualified and uniquely able to represent them in an efficient and timely manner.

## C. Motion Pursuant to District Court Local Rule 83.5 for Admission Pro Hac Vice

39. By way of this motion, the Debtors seek to have Brad R. Godshall and J. Rudy Freeman (collectively, the "Admittees") admitted *pro hac vice* before the United States Bankruptcy Court for the District of Delaware to represent, as proposed attorneys, the Debtors in the Chapter 11 Cases, pursuant to Local Rule 83.5(c) of the United States District Court for the District of Delaware.

## D. Application the Debtors for an Order Approving The Retention of and Appointing Robert L. Berger & Associates, LLC, as Noticing, Claims and Balloting Agent for Clerk of the Bankruptcy Court.

40. The Debtors desire to retain Robert L. Berger & Associates, LLC ("Berger & Associates") as their noticing, claims and balloting agent. In consideration of the number of anticipated claimants and other parties-in-interest and the nature of the Debtors' businesses, the appointment of Berger & Associates will expedite the distribution of notices and relieve the Clerk's office of the administrative burden of processing such notices. Berger & Associates has substantial experience in the matters upon which it is to be engaged and has acted in this capacity in several cases in this judicial district.

**E.**     **Motion of the Debtors for an Order Authorizing the Debtors
to Retain, Employ and Compensate Certain Professionals
Utilized by the Debtors in the Ordinary Course of Business.**

41.     In the ordinary course of operating their businesses, the Debtors retain and employ different professional firms that provide, among other things, various ongoing legal, actuarial and employee benefit consulting services.  To minimize any disruption to their operations, the Debtors seek authority to retain, *nunc pro tunc* to the Petition Date, professionals the Debtors may require from time to time during the pendency of these Chapter 11 Cases, to render discrete services to the Debtors in a variety of matters affecting their day-to-day business operations (the "Ordinary Course Professionals").  The services of the Ordinary Course Professionals shall not include the administration of the Debtors' chapter 11 cases and matters that will be handled by the professionals being retained by the Debtors through separate motion to the Court.

**F.**     **Motion of the Debtors for an Order Establishing
Procedures for Interim Compensation and
Reimbursement of Expenses of Professionals.**

42.     The Debtors seek to establish administrative procedures for the interim compensation and reimbursement of expenses for the non "ordinary course" professionals (the "Professionals").  The proposed procedure, which is used in this District in cases of like size and complexity, provide the appropriate balance between promoting the efficient administration of payment of compensation and reimbursement of expenses for the Professionals and providing the Court and parties-in-interest with sufficient opportunity to review payments to the Professionals.

**G.** **Motion of the Debtors for an Order (I) Authorizing the Debtors to Pay Prepetition Sales, Use and Gross Taxes and Regulatory Fees and (II) Authorizing Banks and Service Providers to Honor and Process Checks and Transfers Related Thereto**

43.     By this Motion, pursuant to sections 105(a), 363 and 507(a) of the Bankruptcy Code, the Debtors seek authority to pay, or to authorize the Service Providers to pay, in the Debtors' sole discretion, prepetition Sales Taxes and Regulatory Fees owed to the Taxing and Regulatory Authorities, including, without limitation, Sales Taxes and Regulatory Fees subsequently determined upon audit to be owed for periods prior to the Petition Date in an amount not to exceed $552,775 which is the aggregate sum that the Debtors believe their current prepetition Sales Taxes and Regulatory Fees will not exceed.

44.     To the extent any check or electronic transfer issued prior to the Petition Date to satisfy any prepetition obligation on account of Sales Taxes or Regulatory Fees has not cleared the Banks as of the Petition Date, the Debtors request the Court to authorize the Banks and the Service Providers, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay such outstanding Sales Taxes and Regulatory Fees owing for periods prior to the Petition Date.[4]

45.     For the reasons described further in the motion, the payment of any prepetition Sales Taxes and Regulatory Fees will help the Debtors avoid serious disruption to

---

[4] Because each of the checks or electronic transfers is readily identified as relating directly to an authorized payment of prepetition Sales Taxes and Regulatory Fees, the Debtors believe that checks and electronic transfers for payments that are not authorized will not be honored inadvertently.

their reorganization efforts that would result from the nonpayment of such taxes and fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers.

**H.    Motion of the Debtors Pursuant to Section 105(A) of the Bankruptcy Code for an Order Authorizing the Payment of Prepetition Claims of Critical Trade Vendors in Exchange for Continuing Relationship Pursuant to Customary Trade Terms**

46.    By the nature of their businesses, the Debtors deal with vendors that are typically the sole suppliers of uniquely branded products or services for which there are no viable substitutes, such as satellite/transponder companies that serve as a conduit for Debtors to provide their music service and programming product to customers, (collectively, the "Satellite Suppliers").

47.    In addition to the Satellite Suppliers, the Debtors rely on other vendors to support their core business functions by way of administrative and ancillary support, such as regional and local distribution of the Debtors' services, installation of the Debtors' proprietary subscription music equipment, and sound systems engineering services (collectively, with the Satellite Suppliers, the "Critical Vendors"). The Debtors estimate that, as of the Petition Date, they owe the Critical Vendors approximately $1.2 million (the "Critical Vendor Claims").

48.    The Debtors request authorization to pay all, a portion, or none of the Critical Vendor Claims as determined by the Debtors in their sole discretion in order to continue the vital goods and services provided by the Critical Vendors. The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods and services to the Debtors on such customary trade terms that were

most favorable to Debtors and in effect between such trade creditor and Debtors on a historical basis within thirty (30) days of the Petition Date (the "Customary Trade Terms"). The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

49. To ensure that Critical Vendors deal with the Debtors on Customary Trade Terms, the Debtors propose that (a) a letter substantially in the form of the letter attached as Exhibit A to the Motion be sent to the Critical Vendors (the "Critical Trade Agreement") along with a copy of the Order and (b) checks used to pay Critical Vendors contain a legend substantially in the following form:

> Acceptance of this check is subject to the Order Authorizing Payment of Prepetition Critical Vendor Claims in Exchange for Continuing Relationship Pursuant to Customary Trade Terms, dated _____ __, 2005, Case No. 05-_____ (____) (Jointly Administered).

50. The Debtors further propose that they be authorized to reserve their rights to obtain written acknowledgment of the Customary Trade Terms of a Critical Vendor Creditor before paying such creditor's Critical Vendor payment, such written acknowledgment to be substantially in the form of Exhibit B to the Motion. If the Debtors request such acknowledgment, they may rely upon a confirming memorandum setting forth the Customary Trade Terms, whether received by facsimile, electronic mail, express mail, or by other customary modes of delivery. For those Critical Vendors who have agreed to ship on other than Customary Trade Terms, the Debtors reserve the right to obtain written acknowledgment of such terms on a case-by-case basis. The Debtors also reserve their right to contest any invoice of any Critical Vendor Creditor under applicable non-bankruptcy law.

51.     Some of the Critical Vendors also may have obtained mechanics' liens, possessory liens, or similar state law trade liens (the "Trade Liens") on the Debtors' assets, based upon Critical Vendor Payment held by such Critical Vendors.  As a further condition of receiving payment on a Critical Vendor Payment, the Debtors propose that a Critical Vendor Creditor must agree to take whatever action is necessary to remove the Trade Lien at such Critical Vendor Creditor's sole cost and expense.

52.     If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms following receipt of payment on its Critical Vendor Claim, or fails to comply with any Critical Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may seek authority, in their discretion and without further order of the Court, to declare that provisional payments made to Critical Vendors on account of Critical Vendor claims be deemed to have been in payment of then-outstanding postpetition claims of such vendors and require that the Critical Vendor shall then immediately repay to the Debtors any payment made to it on account of its Critical Vendor Claims without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise.

53.     Pursuant to the Motion, the Debtors seek entry of an order authorizing them to pay, in the reasonable exercise of their business judgment, the prepetition claims of certain Critical Vendors that are essential to the uninterrupted functioning of the Debtors' business operations.  Payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts as (a) goods and services provided by the Critical Vendors are often the only source from which the Debtors can procure certain goods or services, (b) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtors, very likely result in the

Critical Vendors terminating their provision of goods/and or services to the Debtors, and/or (c) the Critical Vendors would themselves be irreparably damaged by the Debtors' failure to pay the Critical Vendor Claims. The relief requested in this Motion is subject to the terms of any cash collateral agreements reached with the Debtors by the Prepetition Lenders.

I.    **Motion of the Debtors for an Order: (I) Authorizing the Debtors to Pay and Honor Certain Prepetition of Employee Obligations and Programs and to Continue Employee Benefit Plans and Programs Postpetition; (II) Authorizing Banks to Honor Checks for Payment of the Foregoing; and (III) Granting Related Relief**

54.    As of the Petition Date, the Debtors employed approximately 575 employees, of whom approximately 275 were salaried and 300 were hourly employees (collectively, the "Employees"). Virtually all of the Debtors' Employees are full-time employees. Approximately 350 of the Debtors' employees are located in California and Washington with the balance located in approximately twenty other states. None of the Debtors' Employees are subject to a collective bargaining agreement.

55.    The Debtors' Employees perform a variety of critical functions for the Debtors, including, without limitation, nationwide sales and marketing of music and imaging services, custom music programming, design, engineering and installation of audio/video systems, design of proprietary audio/visual distribution platforms, and company-wide backoffice support (customer service, billing, financial reporting, and human resources). The Employees' skills and their specialized knowledge and understanding of the Debtors' infrastructure and operations are essential to the Debtors' continuing operations and to the Debtors' ability to effectuate a successful sale and reorganization.

## Unpaid Wages, Commissions and Reimbursable Expenses

56. The Debtors' salaried and hourly Employees are paid bi-weekly in the ordinary course of business. The last payroll paid was February 11, 2005. As of the Petition Date, it is estimated that $25,074.00 in wages for overtime and weekend work have accrued and remain unpaid. No employee is owed more than the $4,925.00 priority limit.

57. In addition, certain of the employees (primarily sales staff and licensed agents) are paid commissions on a periodic basis based upon sales made prior to that period. As of the Petition Date, no commissions are payable at this time. However, because some of the sales for which commissions will be payable post-petition may have been made prior to the Petition Date, the Debtors seek, out of an abundance of caution, authority to pay the commissions when they become payable. The Debtors do not know at this time what the amount of the commissions for February sales will be but the commissions paid to approximately 90 employees for January sales were approximately $230,000.

58. Certain Employees have also incurred business expenses that, consistent with ordinary practice, are reimbursable by the Debtors (the "Reimbursable Expenses"). These include expenses for relocation, travel and incidental expenses such as parking, auto care and tolls. The Debtors estimate that, as of the Petition Date, accrued but unpaid reimbursable Employee expenses aggregate to approximately $77,936.00 spread among approximately 200 employees.

## Employee Benefits

59. Prior to the Petition Date, the Debtors offered Employees many standard employee benefits that Debtors intend to maintain during these cases, including, without

limitation, (a) medical, dental, mental health and vision claims under the Debtors' group health care plan, (b) COBRA, (c) basic term life, accidental death and dismemberment ("AD&D"), (d) supplemental life insurance (excluding the Debtors' executive life insurance plan), (e) supplemental accidental death and dismemberment, (f) business travel accident and disability insurance, (g) disability benefits, (h) employee assistance programs, (i) flexible spending plans, (j) 401(K) plans,[5] (k) legal service plan and (l) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "Employee Benefit Plans"). The Debtors estimate that accrued, unpaid obligations under the Employee Benefit Plans as of the Petition Date are estimated to be between $850,000.00 and $1 million.

60. If prepetition benefit, compensation and reimbursement amounts are not received by the Employees in the ordinary course, they will suffer extreme personal hardship and in many cases will be unable to pay their basic living expenses. Such a result obviously would destroy Employee morale and result in unmanageable Employee turnover. Any significant deterioration in morale at this time will substantially and adversely impact the Debtors and the Debtors' ability to sell their assets at the highest price, thereby resulting in immediate and irreparable harm to the Debtors.

**Workers' Compensation**

61. The Debtors also currently maintain premium-based workers' compensation coverage (the "Workers' Compensation Program"). Debtors comply with all

---

[5] Employees may contribute from 1% to 50% of their salary up to the IRS maximum of $13,000 on a pre-tax basis. Debtors match, in cash, 66.67% of the employees' contributions, up to a maximum of 6% of the employees' compensation. In other words, if an employee contributes 6% or greater of his or her compensation, the company matches 4%. If the employee contributes less than 6% of his or her compensation, the company match is 66.7% of the contribution amount (e.g., if the employee were to contribute 4%, the company contribution would be 2.67%) (the "401(k) Program").

applicable state workers' compensation laws. Debtors are insured in respect of workers' compensation through a policy with CNA (the "CNA Policy"). The current term of the CNA Policy runs through July 31, 2005 and the annual premium is $64,000.00. Debtors have paid the premium on the CNA Policy through July 7, 2005.

62.     The CNA Policy carries a $350,000 deductible and a $1 million limit per accident. Debtors are self-insured to the extent injuries are not covered by its insurance, but Debtors have pre-funded a $143,598 "loss fund" that, based on history, Debtors expect to be more than sufficient to cover anticipated claims. However, out of an abundance of caution and even though the Debtors do not believe any prepetition amounts remain unpaid, the Debtors request authority to continue their Workers' Compensation Program and to pay any prepetition claims, assessments and premiums (collectively, "Workers Compensation Obligations"). Alternative arrangements for workers' compensation coverage would in all likelihood, be much more costly, and the failure to provide coverage may, in some states, subject the Debtors and/or their officers to draconian penalties.

### Payroll Taxes and Other Withheld Amounts

63.     The Debtors are also required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Trust Fund Taxes") and remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Debtors are required to match from their own funds the social security and Medicare taxes, and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Trust Fund Taxes, the "Payroll Taxes") and to

remit the Payroll Taxes to the Taxing Authorities. The Debtors' Payroll Taxes, including both the employee and the employer portion, for the period of January 31, 2005 through the Petition Date ($1,031,384.00), and SUI (State Unemployment Insurance) taxes for payroll periods January 1, 2005 through the Petition Date ($114,298.00) are approximately $1,145,682.00. The Debtors are current on all of their Payroll Taxes as of the Petition Date. By this Motion, the Debtors seek authority to pay and/or remit the Payroll Taxes attributable to the period prior to the Petition Date to the applicable Taxing Authorities.

64. In addition, the Debtors seek authority to remit other amounts withheld, at the direction of the Employee or judicial authority, from Employees' paychecks (the "Withheld Amounts ") to appropriate third-parties according to the Debtors practice prior to the Petition Date.

**Paid Time Off Policy**

65. In addition to payroll compensation and Employee Benefit Plans, the Debtors also provide their Employees, in the ordinary course of business, with a number of other employee benefits, some of which are mandated by statute. Specifically, the Debtors offer paid vacation that accrues as described below, one floating holiday and other set company holidays, ten days of sick leave and two personal days ("PTO") to all full-time, non-Vice President, Employees working 40 hours per week as described below (collectively, the "PTO Policy"). Eligible non-Vice President Employees are offered paid vacation leave that accrues at a rate of 3.1 hours per pay period (10 days per year) for those employees with service of less than five years, 4.62 hours per pay period (15 days per year) for those employees with service of 5 years to less than 10 years, and 6.16 hours per pay period (20 days per year) for Employees with service

of more than 10 years. Regular employees who work more than twenty hours but less than forty hours per week will accrue vacation time on a prorated basis according to the above schedule. Employees with the level of Vice President or above are offered paid vacation which accrues at the rate of 4.6 hours per pay period (15 days per year) for those employees with service of less than 10 years and 6.16 hours per pay period (20 days per year) for those with service of more than 10 years.

66.     Pursuant to the PTO Policy, eligible Employees can earn their full wages for each vacation, holiday, personal and sick leave day, up to the maximum of days accrued by such Employee. Unused vacation time generally is paid to Employees only upon the termination of employment by the Debtors or death, where legally required. The Debtors estimate that the accrued, outstanding amount of unused time under the PTO Policy, if it were payable in cash, would be approximately $1.5 million as of the Petition Date. The Debtors are seeking authorization, in their sole discretion, to continue honoring the PTO Policy and to make cash payments for unused PTO that has accrued prepetition as well as postpetition only upon the termination of an employee by the Debtors as they would have done under the PTO Policy prior to the Petition Date.

**Prepetition Processing Obligations**

67.     The Debtors also request that they be authorized, in their sole discretion, to pay all processing obligations related to the administration and maintenance of Debtors' employee benefit plans and payroll processing ("the Processing Obligations"). The Debtors estimate the aggregate amount of such Processing Obligations accrued but unpaid as of the Petition Date, was approximately $396,000.00.

**J.    Motion for an Order Authorizing
        Continuation of Key Employee Retention Plan**

68.    The Debtors' workforce consists of many highly skilled workers, many of which are virtually impossible to replace given the state of the marketplace. The industry in which the Debtors operate is highly competitive, with ample employment opportunities for those individuals possessing the skills associated with the Debtors' workforce. As a result, the Debtors' workforce is one of the estates' most significant assets.

69.    The Debtors' financial difficulties are known by its employees. The employees appreciate that the Debtors' cash balances are growing increasingly smaller and that their future employee prospects are unclear. Employee morale is extremely low, and the rate with which employees have begun tendering their resignations has increased significantly, especially since late in 2004, when information regarding the potential bankruptcy filing was included in public securities filings.

70.    In order to insure that the Debtors retained the employment of the employees ("Participants") necessary to maintain operations through a Sale, the Debtors' Board instituted a key employee retention plan (the "KERP") in April, 2004, modified on February 4, 2005.

71.    The Employees are particularly important to administering Debtors' ongoing businesses and the Sale process. This is particularly true, given Debtors' obvious inability to find replacements (short term or otherwise), given the impending sale.

The Debtors seek an order approving the continuation of the KERP as to the Employees in order to stabilize their key management force and to accomplish and promote a successful reorganization.

**Overview of the KERP**

72.    The KERP has three different compensation components, to which various "Participants" are entitled.[6] The three components are as follows:

a.    Success Bonus. Last Spring, the Board implemented a success bonus program (the "Success Bonus"), conditioned upon Debtors achieving designated monthly EBITDA levels which the Board believed would materially increase the attractiveness of Debtors as an acquisition target by a potential purchaser. The targeted EBITDA were not consistent for all Participants. In some instances, the targeted EBITDA levels were not attained, and Participants were therefore removed from the KERP. To further incentivize the Chief Executive Officer and Chief Financial Officer to maximize the going concern value of Debtors' businesses, the Success Bonus payable to each of those two individuals also is conditioned on upon the realization of value in excess of the existing Capstar Offer (through a combination of the consummation of a higher or otherwise better Successful Offer plus, if applicable, the enterprise value of any remaining portion of the business that is reorganized pursuant to a confirmed plan), and the amount of such Success Bonus is a function of the extent of any excess value. The Board determined that Success Bonuses would only be payable out of the proceeds of a Sale. As of the Petition Date, Success Bonuses payable aggregate $490,492 among six Participants.

---

[6] The following description of the KERP is merely a summary, and does not purport to be an exhaustive itemization of each of the terms thereof. The description is qualified in its entirety by the provisions of the KERP itself.

b.  Retention Bonus.  The Board also determined last Spring that it was necessary to keep key employees in place and their attentions focused, while the Sale process was continuing.  The Board therefore also established a Retention Bonus program as part of the KERP.  The condition for receiving a Retention Bonus, generally speaking, is remaining in employ with Debtors and in good standing through the consummation of the Sale.  To further incentive the Chief Executive Officer and Chief Financial Officer to maximize the going concern value of Debtors' businesses, the Retention Bonus payable to each of those two individuals also is conditioned on upon either the successful closing the Capstar Offer or a higher or otherwise better Successful Offer or the consummation of a consensual plan of reorganization.  Retention Bonuses would be paid upon the consummation of the Sale.  Thirteen Participants are eligible for Retention Bonuses, with the aggregate amount potentially payable being $1,301,850.

c.  Severance.  The Board also determined that severance should be included as an aspect of the KERP.  In many instances, the severance proposed either mirrored or was in replacement for severance payable under existing employment contracts.  The primary distinction between the severance and retention bonus components of the KERP is that severance is not payable if "Acceptable Replacement Employment" is offered to a Participant by the proposed buyer under the Sale.  See KERP at p. 7.  There are thirteen Participants eligible for Severance, with an aggregate potential payment of $1,924,046.  As indicated, however, this amount is likely to be materially reduced, assuming the buyer in conjunction with the closing of the Sale offers Acceptable Replacement Employment to key personnel.  (No such commitments have been made as of the date hereof.)

73.    The foregoing KERP was implemented by the Board with the guidance of its advisors at that time – Ernst & Young Corporate Finance.[7]  Based on this guidance, the Debtors believe that the KERP is well within any "market" range of what has been previously found acceptable in other chapter 11 cases.

**K.    Motion of the Debtors for an Order Under Section 365(a)
of the Bankruptcy Code Authorizing the Rejection of
Certain Unexpired, Nonresidential Real Property Leases**

74.    The Debtors herein, are parties to approximately 25 (in the aggregate) leases of nonresidential real property (collectively, the "Properties" and "Leases") located throughout the United States.  These Properties comprise the entire portion of the Debtors' business operations in the United States.  In the 12 month fiscal period preceding the Petition Date, the Debtors paid approximately $4.5 million in the aggregate, on account of rent and other non-rent expenses under the Leases

75.    The Debtors propose to reject eight (8) of the 25 Leases located in the United States (the "Rejected Leases").  A schedule of the Rejected Leases is set forth on Exhibit A to the Motion.

76.    At least 30 days prior to the Petition Date, the Debtors vacated each of the premises covered by the Rejected Leases and the landlords, prior to the Petition Date, were made aware of such vacation and that Debtors did not intend to further occupy the premises.

---

[7] Ernst & Young Corporate Finance ("EYCF") was subsequently sold to the Debtors' existing financial advisors -- Giuliani Capital Advisors.

77.     By rejecting the Rejected Leases at the onset of these Chapter 11 Cases, the Debtors will save approximately $60,000 a month - or over $2,000 per day - in administrative costs associated with the continued occupancy of the premises subject to the Rejected Leases.[8]

78.     By this Motion, the Debtors seek authority, pursuant to section 365(a) of the Bankruptcy Code, to reject the Rejected Leases effective as of the Petition Date.

79.     In addition, in connection with certain of the Rejected Leases, the Debtors may have deposited monies with a non-debtor, counter-party as a security deposit or other similar arrangement.  The Debtors request that the Court, pursuant to section 362(a)(7) of the Bankruptcy Code, prohibit the setoff or other use of any such security deposits without prior authorization of this Court.  Also, in some instances, the Debtors may have claims against a lessor arising under, or independently of, the Rejected Lease.  The Debtors do not waive any claims or defenses by the filing of this Motion or the rejection of the Rejected Leases, and hereby expressly reserve all of their rights with respect thereto.

80.     The Debtors request that the Court enter an order granting the relief requested herein as soon as possible.  Within 2 business days after entry of the order, the Debtors will serve the order and this Motion on all lessors, subtenants and other parties entitled to notice under the Rejected Leases (collectively, the "Notice Parties").  The Notice Parties shall have 20 calendar days from the date of service of the order to file an objection to the relief granted in the

---

[8] The Debtors are in the process of evaluating their other nonresidential real property leases to determine which are valuable to the estates and which are burdensome.  Because the evaluation process is ongoing, the Debtors anticipate identifying additional burdensome nonresidential real property leases, and seeking the authority to reject or assume and assign such leases at later dates by separate motion.  Concurrently herewith, the Debtors are filing administrative motions seeking to establish procedures on a going forward basis in these chapter 11 cases for the rejection of certain of the remaining non-residential real property leases.  This procedures motion does not apply to the relief requested in this Motion.

order. For all Rejected Leases for which no objection is timely filed and served, the Debtors will

file with the Court a Certificate of No Objection, and the order will be deemed a final order with

respect to such Rejected Leases. For those Rejected Leases for which an objection has been

timely filed and served, the objection will be heard by the Court at the next scheduled omnibus

hearing date.

**L.     Motion of the Debtors for an Order
        Authorizing Rejection of Certain Contracts**

81.     Debtors originally engaged Centerbeam, Inc. to provide information

technology (IT) support to all U.S. and Canadian users including, deploying and updating of

Windows and Microsoft Office software, maintenance of anti-virus defense systems, daily back-

up of the systems and customer service/help desk support for all users. The original economics

of that deal are no longer favorable to the Debtors, or the Debtors' estates.

82.     Likewise, Debtors entered into equipment leases with Xerox, Inc. and

Total Office System, Inc. for photocopiers used in Debtors' daily business operations.

83.     At this juncture, Debtors seek to reject those executory contracts relating

to operations which have already been transferred and/or are unnecessary for ongoing operations.

A list of the contracts to be rejected (the "Rejected Contracts") are set forth on Exhibit A to the

Motion.

84.     The Debtors estimate that such rejection will save the estates in excess of

$26,000 per month in administrative expenses during these Chapter 11 Cases.

85. By this Motion, pursuant to section 365(a) of the Bankruptcy Code and Fed. R. Bankr. P. 6006, the Debtors seek entry of an order by this Court authorizing them to reject the Rejected Contracts effective as of the Petition Date.

86. In light of the costs incurred by the estates on account of the Rejected Contracts - in excess of $26,000 per month, with no corresponding benefit to the estates or the Debtors' ongoing business operations - the Debtors request that the Court enter an order granting the relief requested herein as soon as possible. Within 2 business days after entry of the order, the Debtors will serve the order and this Motion on all counter-parties to the Rejected Contracts (the "Notice Parties"). The Notice Parties shall have 20 calendar days from the date of service of the order to file an objection (the "Objection Period") to the relief granted in the order. After the expiration of the Objection Period, the Debtors will file with the Court a Certificate of No Objection, together with a schedule of those Rejected Contracts for which no objection was timely filed, and the order will be deemed a final order with respect to such Rejected Contracts. For those Rejected Contracts for which an objection has been timely filed and served, the objection will be heard by the Court at the next scheduled omnibus hearing date.

**M.  Motion of the Debtors for an Order Authorizing the Debtors to Continue to Use Their Existing (A) Cash Management System, (B) Accounts, and (C) Business Forms**

87. Prior to the commencement of these Chapter 11 Cases, the Debtors, in the ordinary course of business, maintained approximately nine bank accounts (collectively, the "Bank Accounts") in four states. The Debtors managed cash receipts and disbursements for the Debtors' entire corporate enterprise through the Bank Accounts. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Bank Accounts by various

methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. In addition, the Debtors generate thousands of checks per month from the Bank Accounts. It is the Debtors' belief that U.S. Bank, where all the Bank Accounts are maintained, is a financially stable banking institution with FDIC or FSLIC insurance or other appropriate government-guaranteed deposit protection insurance (e.g., CDIC insurance). A list of the Bank Accounts is attached as Exhibit A to the Motion.

88.     Substantially all of the Debtors' bank accounts are maintained as zero balance or minimum balance accounts and do not maintain significant fund balances overnight. Any excess cash generated by the Debtors that is not used to pay the operating expenses of the Debtors is currently held in the operating/concentration account. Amounts that will remain in the operating/concentration account overnight are expected to be de minimis.

89.     Prior to the Petition Date, the Debtors, in the ordinary course of business, used their established cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System"). A diagram of the Cash Management System is attached hereto as Exhibit B.

90.     As indicated on Exhibit A and Exhibit B to the Motion, Debtors maintain accounts for cash receipts, cash disbursements, payroll, merchant services, petty cash, and operations.

### Operating/Concentration Account – Debtors' Main Account

91.     On a daily basis, all cash receipts (including lockbox deposits from the National and Local Sales Office, and the Affiliates, as well as credit card receipts from Merchant

Services) are swept to this account (the "Operating/Concentration Account"). This account funds

amounts needed for the Controlled Disbursement and Payroll Accounts. Also, from time to time

and as directed by Debtors' corporate accounting, reimbursements are transferred to the three

Petty Cash Accounts, located in Atlanta, Georgia, Boston, Massachusetts and Germantown,

Maryland to fund the Local Sales Offices.

### Cash Receipts – LockBox and Merchant Services Accounts

92.     Lockbox Account – Payments on accounts are received at 1 of 2 lockbox

addresses in Seattle, Washington. One address is for payments from large national clients and

local sales offices (LSO). The second is for payments from Affiliates, such as resellers and cable

companies that resell Debtors' service to consumer and commercial accounts. The payments

received are then deposited into the Lockbox Account, as shown on Exhibit B to the Motion.

The funds in the Lockbox Account are swept into the Operating/Concentration Account on a

daily basis.

93.     Merchant Services Account – Credit cards (including VISA/Mastercard,

and American Express) payment receipts are collected in the Merchant Services Account.

Receipts are swept to the Debtors' Operating/Concentration Account on a daily basis.

### Cash Disbursements

94.     Controlled Disbursement Account – All accounts payable disbursements

for the Debtors are made from the Controlled Disbursement Account. The Controlled

Disbursement Account is funded from the Operating/Concentration Account based on checks

presented on a daily basis and is a zero balance account. The Debtors intend to close the existing

Controlled Disbursement Account, and are seeking authority to open a new debtor in possession

controlled disbursement account ("DIP Controlled Disbursement Account"), post- petition. Debtors will utilize the new DIP Controlled Disbursement Account in the same fashion as the prepetition Controlled Disbursement Account described herein.

95.     Payroll Account – Currently Debtors use Automatic Data Processing, Inc. ("ADP") to provide payroll services and process their payroll checks. ADP debits the Payroll Account for all payroll taxes and direct deposits. Debtors' payroll checks are issued from this account and this account is funded from Operating/Concentration Account on a daily basis. The Payroll Account is a zero balance account. The Debtors intend to close the Payroll Account and to open a new debtor in possession payroll account (the "DIP Payroll Account"). The DIP Payroll Account will not be a zero-balance account but will be a fully-funded, non-zero balance account. The amount remaining in the DIP Payroll Account over any given night is expected to be de minimis.

96.     Local Sales Office Petty Cash Accounts – Debtors currently have three regional Local Sales Offices ("LSO") located in Atlanta, Georgia, Boston, Massachusetts and Germantown, Maryland, and each LSO has a petty cash checking account in the city where it is located. Checks are written from the Petty Cash Accounts for the LSO's operating expenses. The LSO's submit reimbursement requests to Debtors' corporate office. Upon approval, LSO reimbursements are funded from the Operating/Concentration Account. Debtors intend to close all existing Petty Cash Accounts, and may choose to open debtor in possession petty cash accounts in their place. If the new petty cash accounts are opened, he Debtors will utilize these new accounts in the same fashion as the prepetition Petty Cash Accounts.

97.     Daily transfers in and out of all of the Bank Accounts vary within a range of $1,000,000 and $5,000,000.

98.     The Cash Management System includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, should that be necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. As they have done in the ordinary course of business prior to the Petition Date, the Debtors will continue to maintain detailed records reflecting all transfers of funds.

99.     The Debtors' cash management procedures are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

100.    Prior to the Petition Date, the Debtors in the ordinary course of their businesses, also used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks (collectively, the "Business Forms"). The regulated nature of certain parts of the Debtors' business results in documentation of transactions on specific Business Forms. The Debtors have a supply of these forms on hand. It would be expensive and wasteful to destroy these forms and create new ones with the "Debtor in Possession" legend.

101.    By this Motion, pursuant to sections 105(a), 1107 and 1108 of the Bankruptcy Code the Debtors seek entry of an order by this Court authorizing:

a.    the Debtors to continue to use their integrated Cash Management System, including (i) the continued use of certain of their existing Bank Accounts as set forth above with the same names and account numbers as existed immediately prior to the Chapter 11 Cases, except as may otherwise be required by any applicable cash collateral or postpetition financing orders; (ii) the opening of new accounts as debtor in possession accounts as set forth above, (iii) the Debtors to deposit funds in and withdraw funds from any existing and new accounts by all usual means, including, but not limited to, checks, wire transfers, electronic funds transfers and other debits; (iv) the Debtors to otherwise treat the prepetition Bank Accounts (and any accounts opened postpetition) for all purposes as debtor in possession accounts; (v) the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments; (vi) all banks with which the Debtors maintain or establish bank accounts to maintain, service and administer such accounts, except that they shall not be authorized to honor any check issued or dated prior to the Petition Date absent an order of this Court; and

b.    the Debtors to continue to use the Debtors' existing checks and business forms without alteration or change; provided that upon depletion of the Debtors' check stock, the Debtors will obtain checks containing the "Debtor in Possession" legend.

102.    As described in greater detail below, the Debtors submit that the relief requested herein will help to ensure the Debtors' orderly entry into and administration in chapter 11. It also will avoid many of the possible disruptions and distractions that not only could divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 Cases, but also seriously disrupt their operations upon commencement of the bankruptcy cases.

**N. Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

103. In the normal conduct of its business, the Debtors use gas, water, electric, telephone, and other services provided by various utility companies (collectively, the "Utility Services") that service the Debtors' corporate headquarters, as well as their regional facilities (collectively, the "Utility Providers"). Continued and uninterrupted utility service is essential to the Debtors' ability to sustain their operations during these Chapter 11 Cases. Any interruption of utility service would severely disrupt the Debtors' business operations. Prior to the Petition Date, the Debtors generally paid the Utility Providers' bills consistently and on a regular basis. Attached as Exhibit A to the Motion, is a non-exhaustive list of the Utility Providers that provide Utility Services to the Debtors as of the Petition Date.[9]

104. Continuous electric service is critical to the Debtors because the Debtors' facilities are dependent on electricity for lighting and general office use. Accordingly, in the absence of continued electric service, the Debtors' business operations would be severely disrupted.

105. The Debtors are similarly dependent on the continuation of other utility services such as telephone, water, and gas. Maintenance of telephone service is imperative because the Debtors' businesses use telephones to promote and conduct sales and to

---

[9] Neither the omission from or inclusion in Exhibit A is dispositive as to whether a particular party is or is not a utility company, but simply represents the Debtors' attempt to be conservative and inclusive as to the status of such party. The Debtors reserve all rights to further address the characterization of any particular entities listed on Exhibit A as a utility company within the meaning of section 366(a) of the Bankruptcy Code. The relief requested herein is with respect to all Utility Providers and is not limited to only those identified in Exhibit A.

communicate with customers, vendors, and headquarters. Continued water service is necessary to maintain sanitary lavatory facilities for employees. Maintenance of gas service is essential to provide heat to many of the Debtors' facilities and to power other equipment.

106.     Finally, the nature of the Debtors' businesses requires the Debtors to contract for the transmission of voice and data signals over lines owned by third party exchange carriers (i.e., telephone companies) (the "Line Carriers"). The Debtors' day-to-day operations would be severely disrupted by the interruption of any of these services. Additionally, the provision of line services by the Line Carriers is subject to ongoing executory contracts and/or unexpired leases, all of which are, as of the Petition Date, in full force and effect. The Debtors have not received any notices of termination under any of such contracts. Were any Line Carrier to unilaterally seek to disconnect the lines or otherwise suspend line services, the provision of services to the Debtors' customers would literally cease, severely and irreparably damaging the Debtors' estates. The Debtors have historically been current with respect to contractual payments due and owing to all Line Carriers, and have not breached the Line Carrier contracts in any material regard.

107.     By this Motion, pursuant to sections 105(a) and 366 of the Bankruptcy Code, the Debtors seek entry of an order by this Court: (a) prohibiting their Utility Providers from altering, refusing or discontinuing service; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

108.     Specifically, the Debtors seek entry of an order (the "Order") providing, among other things, that:

a.     absent any further order of this Court and except as otherwise provided herein, the Utility Providers may not alter, refuse or discontinue service to, or discriminate against, the Debtors on account of the commencement of these Chapter 11 Cases or any unpaid prepetition charges, or request payment of a deposit or receipt of other security in connection with any unpaid prepetition charges;

b.     the Debtors will serve the Motion and a bridge order granting the Motion on an interim basis (the "Bridge Order"), if granted by the Court, via first-class mail, within three (3) business days of the date the Bridge Order, is entered by the Court on all Utility Providers identified on Exhibit A to the Motion; provided that for any Utility Provider that may have been omitted from Exhibit A, the Debtors shall have the right to supplement such list of Utility Providers and shall promptly provide notice of the Order upon learning of such Utility Provider;

c.     a Utility Provider may request additional assurance of payment within thirty (30) days after the Petition Date (an "Additional Assurance Request") by submitting an Additional Assurance Request to counsel for the Debtors Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California 90067, Attn: Brad R. Godshall, and 919 North Market Street, 16th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn: Laura Davis Jones;

d.     any Additional Assurance Request must (i) be made in writing and (ii) include a summary of the Debtors' payment history relevant to the affected account(s);

e.  if a Utility Provider makes a timely Additional Assurance Request that the Debtors believe is reasonable, then the Debtors shall be authorized in their sole discretion to comply with such request without further order of the Court;

f.  if the Debtors believe the Additional Assurance Request is unreasonable, the Debtors will schedule a hearing to determine adequate assurance to such utility provider as necessary at the next omnibus hearing scheduled in these cases if additional assurance as to payment to such Utility Provider is necessary (the "Determination Hearing");

g.  pending resolution of that issue at any such Determination Hearing, any Utility Provider making an Additional Assurance Request shall be prohibited from altering, refusing or discontinuing service to the Debtors; and

h.  a Utility Provider shall be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further adequate assurance of payment be provided.

109.  Although the Debtors believe that the list of Utility Providers attached as Exhibit A to the Motion is a complete list, the Debtors reserve the right, without further order of the Court, to supplement the list if any Utility Provider has been inadvertently omitted.  If the Debtors supplement the list subsequent to the filing of this Motion, the Debtors promptly will serve a copy of this Motion, and the signed Order, on any Utility Provider that is added to the list by such a supplement.  Concurrently with such service, the Debtors will file with the Court a supplement to Exhibit A adding the name of the Utility Provider so served.  Such an added Utility Provider shall have thirty (30) days from the date of service of this Motion and the Order to make an Additional Assurance Request.  If such an Additional Assurance Request is made, the

Debtors shall abide by the procedures set forth in the Motion, as applicable. Pending resolution of any Determination Hearing relating to an Additional Assurance Request, the Debtors seek an order prohibiting any such Utility Provider from altering, refusing or discontinuing Utility Services to the Debtors.

**O.  Motion of Debtors for Interim and Final Orders (1) Authorizing Use of Cash Collateral, (2) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (3) Granting Security Interests and Priority Claims Pursuant to 11 U.S.C. § 364, (4) Granting Adequate Protection, (5) Modifying Automatic Stay and (6) Setting Final Hearing.**

110.    Debtors require the use of cash collateral and a modest incremental debtor in possession financing facility in the amount of not to exceed $10,000,000 in order to operate efficiently pending the closing of the Sale and to give comfort to their vendors that the Chapter 11 filings will not disrupt Debtors' business operations. Debtors therefore have negotiated the DIP Financing with a sub-group of the Prepetition Secured Lenders (i.e. the Lenders).

111.    Given the expected Sale proceeds will be less than the amount owing to the Prepetition Secured Lenders, it is, of course, wholly unrealistic to expect any party to finance Debtors' operations pending the close of the Sale on anything other than a first priority, secured basis. Debtors nonetheless have inquired of its equity holders (and the Prepetition Secured Lenders themselves) as to whether there would be such an interest. As expected, no interest was offered.

112.    By this Motion, the Debtors request: (a) authority for it to obtain post-petition secured financing pursuant to section 364 of the Bankruptcy Code by entering into the DIP Financing Amendment; (b) authority to grant the Lenders, pursuant to sections 364(c) and (d) of the Bankruptcy Code, security interests and a super-priority administrative expense claim

as set forth in the DIP Financing Amendment; (c) approving the use of cash collateral and the provision of adequate protection to the Agent for the use, sale, or lease of the Prepetition Collateral and for the imposition of the automatic stay; (d) authority to modify the automatic stay in certain respects in connection with the DIP Financing as more particularly set forth in the proposed Interim Order; and (e) the setting of a the Final Hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, all as more fully described in the Interim Order, filed with the Motion.

113.    Pursuant to the DIP Financing Amendment, the principal terms of the DIP Financing generally are:[10]

    a.    Borrower and Guarantors:  Debtors.

    b.    <u>Agent</u>.  RBC.

    c.    <u>Commitment/Availability</u>.  A total revolving credit commitment of up to $10 million (the "Maximum Amount"), with a letter of credit subfacility for Debtors' use ("L/C Subfacility").  During the period commencing on the Petition Date and ending on the date the Bankruptcy Court enters the Final Order, up to $3 million of the DIP Financing shall be available to the Debtors.

    d.    <u>Term</u>.  All loans under the DIP Financing shall be due and payable on the earliest to occur of (i) June 30, 2005; (ii) March 15, 2005, if the Court has not entered the Interim Order and Final Order approving the DIP Financing; (iii) the effective date of Debtors' plan of reorganization; (iv) the occurrence and continuation of an Event of Default and a

---

[10]    In case of any inconsistency between the terms of the DIP Financing as described in this Motion and the DIP Financing Amendment, the DIP Financing Amendment shall control.

determination by the lenders to terminate (v) the permanent reduction of the loan commitments to $0.00; and (vi) the consummation of an asset sale by Debtors (the "Commitment Termination Date").

e.    Priority and Liens.  All obligations of Debtors to the Agent and the Lenders under the DIP Financing (the "DIP Obligations") would have superpriority administrative expense status subject to the Carve Out (as defined below) and other Approved Post-Sale Expenses (as defined in the Financing Order).  The Agent will receive security interests in and liens and mortgages upon all prepetition and post-petition assets of Debtors (collectively, the "DIP Liens"), including, without limitation, all capital stock of Debtors' subsidiaries and all intercompany notes held by Debtors, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral").  The DIP Collateral will include liens on any avoidance actions recovered or avoided under Chapter 5 of the Bankruptcy Code (collectively, "Avoidance Actions") or any proceeds thereof or on the Excluded Equity only to the limited extent provided in paragraphs 5 and 6 of the Financing Orders.  Subject to the Carve Out, the DIP Liens (a) will constitute first priority liens in and to all DIP Collateral to the extent such assets of Debtors are not subject to any valid, perfected, enforceable and non-avoidable lien in existence as of the Petition Date other than the Royal Bank Lien, and (b) would be immediately junior in priority to any and all other valid, perfected, enforceable and non-avoidable liens on the assets of Debtors in existence as of the Petition Date other than statutory and governmental liens filed or otherwise perfected prior to the Petition Date.

f.    Use of Proceeds.  In accordance with the fourteen-week Budget attached to the Interim Order (the "Budget")

g.    <u>Carve Out</u>. A professional fee and committee carve-out described more particularly in the Interim Order.

h.    Fees and Expenses.
*Facility Fee*:    $500,000

Agent Fee:    $200,000

i.    <u>Interest</u>.    All outstanding advances under the DIP Financing shall bear interest at a rate per annum equal to prime plus 2-1/4%.

j.    <u>Events of Default</u>. Events of Default are listed in the Motion.

k.    Sale Process Covenants.

(1)    The Borrower must consummate the Sale by the 105th day following the Petition Date,

(2)    The motions for approval of the Sale and approving Sale procedures must be filed on the fifth day following the Petition Date

(3)    The Bankruptcy Court must enter an order concerning Sale procedures by the 28th day following the Petition Date satisfactory to the Agent and the Required Lenders and in conformity with the requirements of the Capstar Purchase Agreement, approving the Overbid Procedures Motion (the "Overbid Procedures Order");

(4)    The Auction concerning the Sale must occur by the 49th day following the Petition Date; and

(5)    The order approving the Sale must be entered by the 50th day following the Petition Date.

114.    The Interim Order also includes the following provisions and protections for the benefit of the Postpetition Lenders:

a.    **Debtors' Acknowledgement/Waiver/Release.** The Financing Orders shall provide that Debtors acknowledge (a) the validity of the obligations owing to the

Agent and the Prepetition Secured Lenders, without defense, offset or counterclaim of any kind, (b) the validity, perfection and priority of the liens on the assets of Debtors securing the obligations owing to the Agent and the Prepetition Secured Lenders, and that Debtors waive any right to challenge or contest such claims and liens, and (c) that Debtors have no valid claims or causes of action against the Agent or any Prepetition Secured Lenders with respect to the Prepetition Credit Agreement or any related documents or transactions.

        b.    **Provisions of Orders.** The Final Order shall provide that (a) any statutory committee of unsecured creditors shall have 90 days from the date of the Petition Date to commence any adversary proceeding or other proper action against the Agent or the Prepetition Secured Lenders, after which date, if no such objection or adversary proceeding or other action has been timely filed, the claims, liens and security interests of the Agent and the Prepetition Secured Lenders shall, without further order of the bankruptcy court, be deemed to be finally allowed and not be subject to challenge by any party in interest as to validity, priority or otherwise and (b) Debtors and the estates shall be deemed to have released any and all claims or causes of action against the Agent and the Prepetition Secured Lenders with respect to the Prepetition Credit Agreement or the related documents or transactions, without further order of the bankruptcy court. The Financing Orders shall be in form and substance acceptable in all respects to the Agent and the Requisite Lenders and shall include, without limitation, provisions (i) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Financing Orders and the documentation for the DIP Financing, including, without limitation, to permit the creation and perfection of Agent's liens on the DIP Collateral, (ii) providing for the automatic vacation of such stay to permit the enforcement of Agent's and the Lenders' remedies

under the DIP Financing, (iii) prohibiting the assertion of claims arising under Section 506(c) of

the Bankruptcy Code against the Agent, any DIP Lender, the Agent, or any Prepetition Lender,

or the commencement of other actions adverse to the Agent, any DIP Lender, the Agent, or any

Prepetition Lender, or their respective rights and remedies under the DIP Financing, the

Prepetition Credit Agreement, or any bankruptcy court order; (iv) prohibiting the incurrence of

debt with priority equal to or greater than that of the Agent, the Lenders, the Agent, or the

Prepetition Secured Lenders, (v) prohibiting any granting or imposition of liens other than

purchase money priority liens and other liens acceptable to Agent and the Requisite Lenders; and

(vi) prohibiting Debtors' use of cash collateral other than as expressly contemplated by the

Financing Orders prior to the indefeasible payment in full of Debtors' obligations under the DIP

Financing and termination of the Lenders' commitments thereunder.

**P.    Motion For Order Pursuant To Sections 365 Of The Bankruptcy
Code Authorizing And Approving Procedures For The Rejection
Of Executory Contracts And Unexpired Leases Of Nonresidential
Real Property And Authorizing The Compromise Of Rejection
And Related Claims Pursuant To Bankruptcy Rule 9019(B)**

115.    The Debtors are parties to approximately 25 (in the aggregate) leases of

nonresidential real property (individually, a "Lease," collectively, the "Leases"), which

properties are located throughout the United States.  These leased locations comprise

substantially all of the Debtors' United States business operations.  In the 12 months preceding

the Petition Date, the Debtors paid approximately $4.5 million, in the aggregate, on account of

rent and other non-rent expenses under their Leases.

116.    Prior to the Petition Date, the Debtors began the process of evaluating

their Leases to determine which should be rejected because they are unnecessary and/or

burdensome to the Debtors' ongoing business operations.[11]  In some instances, prior to the

Petition Date, the Debtors attempted to negotiate with various landlords to seek a reduction of

rent, square footage and/or lease duration to reduce the costs incurred by the estates under such

Leases.  The Debtors anticipate that they will seek approval of their rejection of additional

Leases after the Petition Date.

117.    As of the Petition Date, the Debtors were also party to numerous

executory contracts.  The Debtors expect that they may have no legitimate need for many of

these contracts in the future.  In connection therewith, the Debtors anticipate that, in addition to

those contracts the Debtors will reject on the Petition Date, the Debtors will, in a very short time,

seek to reject numerous additional contracts.  Absent expedited procedures for managing this

process, the Debtors will inevitably suffer delays and the resulting administrative costs, which

could be material.

118.    In an effort to conserve the resources of the Debtors' estates and minimize

administrative expenses going-forward, the Debtors seek approval of the procedures described

below to facilitate an expeditious and efficient process for rejecting burdensome Leases and

executory contracts.  As described in further detail below, the proposed procedures are intended

to facilitate the rejection process without prejudicing the rights of counter-parties to the Leases

and contracts.

---

[11] On the Petition Date, contemporaneously with the filing of this Motion, the Debtors filed a "Motion of the
Debtors for an Order Authorizing the Rejection of Certain Unexpired, Nonresidential Real Property Leases" (the
"First Day Rejection Motion").  The First Day Rejection Motion seeks authority to reject, effective as of the Petition
Date, eight (8) Leases, as further identified therein, for properties that were already vacated by the Debtors prior to
the Petition Date.  The rejection procedures set forth herein are intended to be prospective and do not apply to the
leases identified in the First Day Rejection Motion

119. In addition, the Debtors seek, pursuant to Federal Rule of Bankruptcy Procedure 9019(b), authority to enter into settlements with real and personal property lessors and counter – parties to executory contracts who assert claims against the Debtors in the amount of $50,000 or less that are related to the rejected executory contract, lease or sublease without further hearing, notice or order of the Court.

120. The Debtors request that the following procedures (the "Rejection Procedures") set forth in the Motion be approved in connection with the rejection of any executory contract, lease, sublease, or interest in such lease or sublease during the course of the Debtors' Chapter 11 Cases.

   a. The Debtors believe that the Rejection Procedures provide a fair and efficient manner for rejecting executory contracts, leases, subleases, and interests in leases and subleases in these Chapter 11 Cases. These procedures will enable the Debtors to minimize unnecessary postpetition obligations and will provide parties with adequate notice of lease rejections and an opportunity to object to such relief within a definitive time period.

121. In addition, the Debtors seek, pursuant to Federal Rule of Bankruptcy Procedure 9019(b), authority to enter into settlements with real and personal property lessors and counter – parties to executory contracts who assert claims against the Debtors in the amount of $50,000 or less that are related to the rejected executory contract, lease or sublease without further hearing, notice or order of the Court.

**Q.** **Motion Of The Debtors For An Order (A) Approving Sale Procedures And Overbid Protections In Connection With Sale Of Substantially All Of The Operating Assets Owned By The Debtors; (B) Scheduling An Auction And Hearing To Consider Approval Of The Sale; (C) Approving Notice Of Respective Dates, Times And Places For Auction And For Hearing On Approval Of (I) Sale And (II Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; (D) Approving Form Of Notice; And (E) Granting Related Relief**

122.    Pursuant to this Sale Procedures Motion, the Debtors are requesting that this Court, among other things:

a.    Approve Section 3.02, the first sentence and last paragraph of Section 3.03, and Sections 3.04, 3.05, 3.06, 15.01, 15.02 and 15.03 of the APA.

b.    Approve THP Capstar's status as the stalking horse purchaser and the Break-Up Fee and Expense Reimbursement (collectively, the "Overbid Protection Payments") for THP Capstar as provided in Section 3.05 of the APA and as further described below;

c.    Approve the overbid procedures described below (the "Overbid Procedures");

d.    Establish a date for the Sale Auction;

e.    Schedule the Sale Hearing to approve any sale transaction(s) to the highest or otherwise best bidder(s) and establishing deadlines for objections and responses to the relief requested in the Sale Motion;

f.    Approve the form of notice (the "Sale Auction and Sale Hearing Notice") of all of the foregoing in substantially the form attached to the Motion as Exhibit "A", as well as a notice to parties holding executory contracts or unexpired leases with the Debtors

(other than customers) that are likely to be assumed and assigned in conjunction with the

Proposed Sale, in substantially the form attached to the Motion as Exhibit "B" (the "Cure

Notice"), and a notice to customers whose contracts are being assumed and assigned in

substantially the form attached to the Motion as Exhibit "C" (the "Customer Notice" and

collectively with the Cure Notice, the "Contract Notices"); and

g.  Approve actual and publication notice of the Sale Motion in

substantially the form of Exhibit "D" attached to the Motion.

**Overbid Protection Payments**

123.  THP Capstar requires the Overbid Protection Payments as an inducement

to go forward with the Proposed Sale.  The Overbid Protection Payments are as follows:

a.  Break-Up Fee. Debtors shall be jointly and severally
obligated to pay THP Capstar a "Break-Up Fee" of
$2,250,000 if: (i)(x) an "Upset Purchase Agreement" (as
defined in the APA) is approved by the Bankruptcy Court
for all or any portion of the Purchased Assets and the
transactions contemplated by the Upset Purchase
Agreement are closed, and (y) as of the earlier to occur of
(A) the conclusion of the Sale Hearing and (B) 100 days
following the Petition Date, the APA has not been
terminated other than pursuant to Section 15.02(h) [12] of the
APA and is not terminable by Sellers pursuant to Section
15.02(l) [13] of the APA, or (ii)(x) if a plan of reorganization
or liquidation that is inconsistent with the APA or the Sale
Procedures Order is filed by or with the express support of
any or all of the Debtors, the DIP Agent or the Prepetition
Secured Lenders, (y) such plan of reorganization or
liquidation is confirmed and "Substantially Consummated"
(as defined in the APA), and (z) at the time of the filing of
such plan, the APA has not been terminated other than
pursuant to Section 15.02(g)[14] or APA Section 15.02(h) and

---

[12]  Addressing termination by Debtors by reason of a higher and better offer accepted by Debtors.

[13]  Addressing termination by Debtors by reason of a breach by THP Capstar.

[14]  Addressing termination by THP Capstar if a plan of liquidation is filed in the above circumstances.

is not terminable by Sellers pursuant to APA Section 15.02(l).

b.      Expense Reimbursement. In the event that any Debtor intentionally breaches any of its covenants under the APA prior to the entry of the Sale Order (it being understood and agreed that (i) a breach arising from Debtors' (as a group) financial inability to comply with any covenant does not constitute an intentional breach of same), and further, that (ii) a breach of any of the Sellers' representations and warranties set forth in the APA, shall not constitute a breach of covenant), and Debtors fail to cure such breach on or before the tenth business day after THP Capstar delivers notice of such breach to Debtors, then THP Capstar may, at its sole election, terminate the APA and receive liquidated damages in the amount not to exceed $1,550,000, in accordance with Section 3.05(c) of the APA (the "Expense Reimbursement").

c.      Payment. The Bid Protection Payments shall be payable as an allowed administrative expense under Section 503 of the Bankruptcy Code, shall be senior in priority to any and all Liens on the Debtors' property, including, without limitation, the liens of the DIP Lenders and the Prepetition Secured Lenders, and shall be paid (i) from the proceeds of any sale of the Purchased Assets pursuant to an Upset Purchase Agreement at the closing thereof in the event of a Closing of an Upset Purchase Agreement as provided in Section 3.05(a)(i) of the APA prior to paying any of the Debtors' creditors, including the DIP Lenders and the Prepetition Secured Lenders, or (ii) as a carve-out from the Cash Collateral of the Debtors' DIP Lenders and the Prepetition Secured Lenders in the event of the Substantial Consummation of a plan of reorganization or liquidation as provided in Section 3.05(a)(ii) of the APA or the termination of the APA pursuant to Section 3.05(b) of the APA.

d.      Included Expenses. As more particularly provided in, and subject to the provisions of, Section 3.05(d) of the APA, the Expense Reimbursement shall apply to (i) all out-of-pocket costs, fees and expenses incurred by Purchaser in the conduct of its due diligence and investigations of the Debtors, and in the pursuit of and negotiation for the purchase of the Purchased Assets, and in the pursuit of and negotiation for equity and debt financing to consummate the same, (ii) all out-of-pocket costs, expenses and fees

incurred in the preparation, review, and negotiation of (x) the APA and the exhibits and schedules thereto, (y) the organizational, formation, investment, and equity documents for the entities formed or to be formed to acquire the Purchased Assets, and (z) the equity financing, loan and credit documents for the financing of the acquisition of the Purchased Assets, (iii) all non-refundable commitment fees, deposits or similar payments made by THP Capstar to financing or equity sources, (iv) all filing or application fees paid by THP Capstar to any Governmental Authority (as defined in the APA), (v) all out-of-pocket costs, fees and expenses of attorneys, accountants, appraisers, investment bankers, brokers and others incurred by THP Capstar in connection with any of the foregoing, and (vi) all out-of-pocket travel costs and expenses incurred by THP Capstar and its agents, representatives, employees and contractors.

## Additional Bid Procedures

124.    Debtors request that the Sale Procedures Order incorporate the following Overbid Procedures, in addition to approving the Overbid Protection Payments:

## Bidder Qualifications

125.    Only qualified bidders (the "Qualified Bidders") may submit an offer (for all or a portion of the Purchased Assets including any executory contracts or unexpired leases that such bidder designates) with respect to the Purchased Assets or otherwise participate in the Sale Auction. [15] Persons or entities who propose to become Qualified Bidders ("Proposed Qualified Bidders"), on or before 5:00 p.m. prevailing Eastern time on the second business day prior to the Auction (the "Bid Deadline"), must comply with each of the following requirements (a "Qualified Bid"):

---

[15] THP Capstar shall be deemed a Qualified Bidder and the THP Capstar Bid a Qualified Bid; provided however, THP Capstar shall not be subject to any of the procedures or requirements to which any Qualified Bid or Qualified Bidder would be subject other than as provided in its APA and any applicable minimum bidding requirements established pursuant hereto.

a. Provide Debtors with evidence that in the discretion of Debtors establishes that the Proposed Qualified Bidder has sufficient financial ability to close and consummate a sale on the terms set forth in its bid (and provide adequate assurance of future performance with respect to any executory contracts or unexpired leases designated by the Proposed Qualified Bidder to take by assignment from Debtors) pursuant to an agreement substantially in the form of the APA, with such modifications as are indicated thereon by the Proposed Qualified Bidder. Any bidder shall provide Debtors and Debtors' counsel, within twenty-four (24) hours after Debtors' request, with financial statements and other documents relating to its business activities and its ability to perform in the event that its bid is accepted (including evidence of the structure and financing of the proposed transaction (cash, notes, etc.) and including the amount of equity to be committed and sources of financing).

b. Unless previously delivered to Debtors, execute a confidentiality agreement in form and substance reasonably satisfactory to Debtors prior to conducting any due diligence or obtaining information reasonably considered confidential by Debtors.

c. Submit an executed form of the asset purchase agreement (as may be subsequently modified pursuant to the bidding procedures set forth herein) (an "Overbid APA"), marked to show all changes from THP Capstar's APA and include with such submission (as applicable) all schedules and exhibits with respect thereto, including, without limitation, a list of all Purchased Assets (including all executory contracts and unexpired leases) that the Proposed Qualified Bidder wishes to include in its bid.

d. Provide for a Closing Date which is not later than the fifth business day following the later of the (x) date on which all conditions to closing set forth in the Overbid

APA are satisfied, and (y) the date the Sale Order becomes a final and non-appealable order; provided that in no event shall the closing occur more than 105 calendar days after the Petition Date.

       e.      Tender a good faith deposit in the form of a bank or certified check in the amount of $3,500,000 to be tendered to counsel to the Debtors (or some other agent selected by the Bankruptcy Court) as a condition to bidding and which will be deposited prior to the commencement of the Sale Auction. If the Proposed Qualified Bidder is the successful bidder(s) with respect to a Sale, the deposit will be applied towards the amount of the successful bid. If the Proposed Qualified Bidder is not a successful bidder(s); the deposit will be returned to such bidder upon the earlier to occur of the conclusion of the Sale Hearing or 100th day following the Petition Date. Any deposit tendered by any bidder that becomes a successful bidder(s) shall be (i) remitted to the Debtors in the event that any such successful bidder(s) fails to close and consummate a sale as a result of its breach of the terms and conditions of its Overbid APA; or (ii) returned to any bidder in the event that such Qualified Bidder's Overbid APA is terminated other than by reason of any breach by the bidder of any of its obligations in connection therewith.

       f.      Provide a written statement by the Proposed Qualified Bidder that (i) such bidder agrees to comply with such other terms and procedures as may be imposed by the Court or the Debtors at or prior to the Sale Auction; (ii) the bid (as the same may be enhanced at the Sale Auction) shall be irrevocable through the earlier to occur of the conclusion of the Sale Hearing or 100th day following the Petition Date; (iii) that the bidder believes in good faith that its bid constitutes a Qualified Bid; (iv) the deposit shall be treated in accordance with the

provisions of this Sale Procedures Motion; and (v) the bid (as the same may be enhanced at the Sale Auction) is not subject to any due diligence or financing conditions.

### Delivery of Qualified Bids

126. Any Qualified Bids for all or substantially all of the Purchased Assets shall be on terms and conditions at least as favorable (as determined by Debtors) to the terms of the APA. Such competing bids must disclose the identity of the competing buyer.

127. Any Qualified Bids shall be in writing (and shall be accompanied by a redline of such bid against the THP Capstar APA) and filed with the Bankruptcy Court by the Bid Deadline, with copies of such bids to be served on and received by the Bid Deadline by:

      a.     the Debtors' counsel- Pachulski, Stang, Ziehl, Young, Jones & Weintraub, Attn: Brad Godshall, 10100 Santa Monica Blvd., 11th Fl., Los Angeles, CA 90067 and Laura Davis Jones, 919 North Market Street, 16th Floor, Wilmington, DE 19801;

      b.     the Debtors' financial advisors – Marc Bilbao, Giuliani Capital Advisors LLC, 725 S. Figueroa Street, Suite 431, Los Angeles, CA 90017;

      c.     counsel to the Creditors Committee;

      d.     counsel to the DIP Agent – Richard Levy, Latham & Watkins, Sears Tower, Suite 5800, Chicago, Illinois 60606;

      e.     Counsel for THP Capstar – Paul E. Heath of Vinson & Elkins, L.L.P., 2001 Ross Avenue, 3700 Trammell Crow Center, Dallas, Texas 75201 and Robert Dehney of Morris, Nichols, Arsht & Tunnell, 1201 North Market Street, PO Box 1347, Wilmington, DE 19899-1347; and

f.    the United States Trustee, Office of the U.S. Trustee, 844 King

Street, Suite 2313, Lockbox 35, Wilmington, DE 19801.

128.    The initial overbid (the "Initial Overbid") by a Qualified Bidder (other

than THP Capstar) for all or substantially all of the Purchased Assets shall be, at a minimum, in

an amount equal to the purchase price in the APA plus (i) an amount equal to the $2,250,000

Break-Up Fee and (ii) $100,000.

129.    Thereafter, any further overbid with respect to all or substantially all of the

Purchased Assets shall be in increments of at least $100,000.

130.    The bidding procedures for bids for less than all or substantially all of the

Purchased Assets will be determined by Debtors in their sole discretion and will be announced at

or before the commencement of the Sale Auction.

131.    Only (a) Proposed Qualified Bidders that submit Qualified Bids and

(b) THP Capstar will be entitled to bid at the Sale Auction. In addition, the Royal Bank of

Canada as Agent and DIP Agent, on behalf of itself and the DIP Lenders and the Prepetition

Secured Lenders, shall be entitled to submit a credit bid for all or any portion of the Purchased

Assets, and shall be automatically deemed to be a Qualified Bidder. In making any such credit

bid, Royal Bank of Canada shall not be subject to any of the procedures and requirements

(including the deposit requirement) to which any Qualified Bidder or Qualified Bid would be

subject, other than any applicable minimum bidding increments established pursuant hereto. In

the event Royal Bank of Canada, on behalf of itself and the DIP Lenders and the Prepetition

Secured Lenders, is the successful bidder for all or any part of the Purchased Assets, THP

Capstar's entitlement to the Break-up Fee or Expense Reimbursement pursuant to the APA and the Sale Procedures Order shall remain in effect.

## The Sale Auction

132.    The Debtors will conduct the Sale Auction at the offices of Debtors' counsel, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, 919 North Market Street, 16th Floor, Wilmington, Delaware, one (1) business day prior to the Sale Hearing at 1:00 p.m.; Eastern Time. Bidding at the Sale Auction will commence with the highest Qualified Bid(s) from Qualified Bidder(s) on individual Purchased Assets and will continue in the established increments until all parties have made their final offers on individual Purchased Assets. Bidding at the Sale Auction will continue with the highest Qualified Bid(s) from Qualified Bidder(s) on discrete groups of Purchased Assets, designated by either the Debtors or any Qualified Bidder(s) prior to or at the Sale Auction, and will continue in the established increments, until all parties have made their final offers on discrete groups of Purchased Assets. Next the Debtors will accept bidding at the Sale Auction from Qualified Bidders seeking to purchase all, or substantially all, of the Purchased Assets, starting with the highest Qualified Bid and continuing in $100,000 increments, until all parties have made their final offers on a sale of all, or substantially all, of the Purchased Assets. At Debtors' discretion, after the completion of the Auction with respect to bids for all, or substantially all, of the Purchased Assets, the Debtors may resume the Auction for bidding on discrete Purchased Assets and/or resume the Auction for bidding on both discrete Purchased Assets and for all, or substantially all of the Purchased Assets.

133.     At the conclusion of the Sale Auction, the Debtors, after consultation with the Royal Bank of Canada (as Agent and DIP Agent) and the Committee, will announce their determination as to the highest or otherwise best bid for all or any portion of the Purchased Assets (the "Successful Bid") by the Qualified Bidder(s) who will become the "Successful Bidder(s)". The Debtors reserve the right to determine which bid or combination of bids, if any, is the highest or otherwise best offer at the Sale Auction. Formal acceptance of a winning bid, however, will not occur unless and until the Court enters an order approving the winning bid and authorizing the Debtors to consummate the sale following the conclusion of the Sale Hearing.

134.     Upon failure to consummate a sale because of a breach or failure on the part of the Successful Bidder(s), the Debtors may select in their business judgment, with the consent of Royal Bank of Canada (as Agent and DIP Agent), the next highest or otherwise best Qualified Bid(s) to be the successful bid(s) without further order of the Court.

## Notice

135.     The Debtors request that this Court schedule the Sale Hearing on or about April 21, 2005.

136.     Pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9014, the Debtors request that they be authorized to give notice of the Sale Motion, the Overbid Procedures, the Sale Auction, and the Sale Hearing by mailing a copy of the Sale Auction and Sale Hearing Notice in substantially the form of Exhibit "A" or Exhibit "C" (in the case of customers) hereto by first class mail, to the following (collectively, the "Notice Parties"):

a.     All creditors (if any) asserting a security interest, lien, encumbrance or other interest against all or any portion of the Purchased Assets;

b.    The Office of the United States Trustee;

c.    All creditors of each of the Debtors (including customers of Debtors);

d.    All applicable federal and state taxing and environmental authorities;

e.    All parties who have requested notice in these Chapter 11 Cases;

f.    all other parties on the Master Service List maintained in these cases; and

g.    All persons or entities who have expressed an interest in acquiring all or any substantial portion of the Purchased Assets, if any (collectively, the "Notice Parties").

137.    The Debtors propose to serve the Sale Auction and Sale Hearing Notice within two days of the entry of the Sales Procedures Order, by first-class mail, postage prepaid on the Notice Parties. The Sale Auction and Sale Hearing Notice provides that any party that has not received a copy of the Sale Motion or the Sale Procedures Order that wishes to obtain a copy of the Sale Motion or the Sale Procedures Order, including all exhibits hereto, may make such a request in writing to Pachulski, Stang, Ziehl, Young, Jones & Weintraub, 10100 Santa Monica Boulevard, Suite 1100, Los Angeles, California (Attn: J. Rudy Freeman).

138.    Debtors also propose to serve notice of the Sale Motion, the Overbid Procedures and the Sale Auction and the Sale Hearing by publication of the Publication Notice in the form as Exhibit "D" to the Motion, in each case to be published by March 31, 2005, in Sound & Communications, Sound and Video and in the Wall Street Journal (national edition).

139.     Debtors also propose to serve the proposed cure notice (the "Cure Notice") in substantially the form of Exhibit B to the Motion on all nondebtor parties to executory contracts and unexpired leases currently with the Debtors (other than customers) that are likely to be assumed and assigned pursuant to the Sale Motion.  If the Court requires changes to the Cure Notice, the Debtors will re-serve the nondebtor parties with the amended Cure Notice.

140.     As indicated, Debtors also propose to serve notice of the Sale Motion and the Sale Hearing and Debtors' intent to assume and assign customer contracts on customers in the form attached as Exhibit C to the Motion by submitting a copy of such notice with customer billings to be sent on March 2, 2005 (the "Customer Notice").  As indicated, Debtors do not believe that any cure amounts are owing in respect of such customer contracts.

141.     At least twenty-three days prior to the Sale Hearing, the Debtors will have filed a schedule of executory contracts and unexpired leases which may be assumed and assigned under the APA ("Assumed Contracts") and will have served the Sale Auction and the Sale Hearing Notice and the Cure Notice upon each counterparty to an executory contract or unexpired lease other than customers (collectively the "Counterparties" and individually, a "Counterparty") with the Debtors that may be assumed by the Debtors and assigned to THP Capstar or other Successful Bidder as part of the sale transaction.  Both the Cure Notice and the Customer Notice (collectively, the "Contract Notices") will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of the Assumed Contracts must be filed and served.  The Contract Notices also will identify the amounts, if any, that the Debtors believe they owe to each Counterparty to an Assumed Contract

in order to cure any defaults that exist under such Assumed Contract (i.e., the "Cure Amounts"). If a contract or lease is assumed and assigned pursuant to this Court's order approving same, the Debtors propose that, unless the Assumed Contract Counterparty properly files and serves an objection to the Cure Amount contained in the Contract Notice, the Assumed Contract Counterparty will receive at the time of the sale closing (or promptly thereafter), the Cure Amount as set forth in the Contract Notice. If an objection is filed by a Counterparty, such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Contract Notice or, as to customers, why the customer believes any cure amount is owing. Notwithstanding anything to the contrary, no executory contract or unexpired lease will be assumed unless and until the closing of the sale relating to the executory contract or unexpired lease in question.

142. In addition, if the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to THP Capstar or other Successful Bidder not set forth in the original Contract Notice, the Debtors seek authority to send a supplemental notice (a "Supplemental Contract Notice") to the Counterparties to such additional executory contracts and unexpired leases. If a Counterparty does not object to any Cure Amount set forth in the Supplemental Contract Notice within eight (8) days from mailing of such notice, the Debtors will cause to be paid the Cure Amounts as set forth in the Supplemental Contract Notice if and when the newly identified contract or lease is eventually assumed by any of the Debtors and assigned to THP Capstar or other Successful Bidder. Any objection must set forth a specific default in any executory contract or unexpired lease and claim

a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Supplemental Contract Notice.

143. The Debtors, THP Capstar or other Successful Bidder may delete any Assumed Contract from the list of Assumed Contracts at any time prior to the Sale Hearing. The nondebtor party or parties to any such deleted contract or lease will be notified of the deletion immediately.

144. The Debtors further request that if any Counterparty objects for any reason to the assumption and assignment of the Assumed Contract to which it is a Counterparty, that Counterparty must file the objection by no later than April 13, 2005 at 4:00 p.m. Eastern time.

145. The Debtors propose that evidence will be provided, providing information supplied by THP Capstar or other Successful Bidder concerning the adequate assurance of its future performance under the Assumed Contracts at the Sale Hearing. It is the Debtors' position that THP Capstar's or other Successful Bidder's promise to perform under the terms of the Assumed Contracts will constitute adequate assurance of future performance under the Assumed Contracts. See 11 U.S.C. § 365(b).

146. Cure Amounts disputed by any Counterparty will be resolved by the Court prior to the closing of the sale.

147. Except to the extent otherwise provided in the APA or Overbid APA, the assignee of the Assumed Contracts will be relieved of any liability to the assigned contract Counterparty that accrued or arose before the closing date of the sale of the Purchased Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

**R. Motion Of The Debtors For An Order: (I) Approving Sale By Debtors Of Substantially All Of Their Operating Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363(B), (F) And (M) Of The Bankruptcy Code, (II) Assuming And Assigning Certain Executory Contracts And Unexpired Leases; And (III) Granting Related Relief**

148. On the Petition Date, Debtors filed a Motion For an Order: (A) Approving Sale Procedures And Overbid Protections In Connection With Proposed Sale Of Substantially All Of The Operating Assets Owned By The Debtors; (B) Scheduling An Auction And Hearing To Consider Approval Of The Proposed Sale; (C) Approving Notice Of Respective Dates, Times And Places For Auction And For Hearing On Approval Of (i) Sale and (ii) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; (D) Approving Form of Notice and (E) Granting Related Relief (the "Sale Procedures Motion"). The Sale Procedures Motion seeks entry of a proposed order (the "Sale Procedures Order") that, *inter alia*, schedules dates, times and places for a hearing on this Sale Motion (the "Sale Hearing") and for the Sale Auction and approving the bidding and Sale Auction procedures (the "Proposed Sale Procedures").

149. Debtors propose in the Sales Procedures Motion that the Sale Procedures Order contain the following material, relevant terms:

        (i)    **The Auction.**

        a.    An auction (the "Sale Auction") will take place on April 20, 2005. Various minimum qualifications for "Qualified Bids" and "Qualified Bidders" are to be established. Qualified Bidders are permitted to submit bids for some or all of the Purchased Assets.

b.     At the conclusion of the Sale Auction, Debtors propose to sell the Purchased Assets and (including, the assumption and assignment of the Assumed Contracts) to the Successful Bidder pursuant to the Sale Procedures Order and this Sale Motion.

**(ii)     Executory Contracts.**

c.     As indicated, the Proposed Sale contemplates that Debtors assume and will assign to the ultimate Successful Bidder the various executory contracts and unexpired leases associated with the Purchased Assets. The Sale Procedures Order requires that the bulk of the executory contracts and unexpired leases that Debtors expect will be assumed and assigned (the "Assumed Contracts") be identified by March 29, 2005 and the list of anticipated Assumed Contracts will be served on all parties at that time. This list however, is necessarily subject to change following the Sale Auction and prior to the Sale Hearing.

d.     Debtors are also required to send contemporaneously a notice (the "Contract Notice" or the "Customer Notice" – collectively, the "Contract Notices") to each counterparty to an Assumed Contract (collectively, the "Counterparties" and individually, the "Counterparty"). The Contract Notice identifies the amount, if any, that Debtors believes it owes to such Counterparty to cure defaults under each respective Assumed Contract (i.e., the "Cure Amounts").[16] If a contract or lease is included on the schedule of Assumed Contracts, unless a Counterparty objects, in writing, to any of the Cure Amounts contained in the Contract Notice, the Counterparty will receive at the time of the Closing (or promptly thereafter), the Cure Amounts as set forth in the Contract Notice. Any objection to the Cure Amounts is required to be filed by April 15, 2005, must set forth any alleged specific default in any Assumed Contract

---

[16] No amounts are owing under customer contracts.

and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Contract Notice. Except to the extent otherwise expressly provided in the underlying asset purchase agreement,[17] the assignee of the Assumed Contracts will be relieved of any liability to Counterparties to any assigned contract or lease that accrued or arose before the Closing and Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

e. As indicated, the Sale Procedures Order permits Debtors to identify additional executory contracts or unexpired leases that might be assumed by Debtors and assigned to the Successful Bidder not set forth in the original Contract Notices and permitted Debtors to send a supplemental Contract Notice (a "Supplemental Contract Notice") to the Counterparties to such additional executory contracts or unexpired leases.[18] The Procedures Order provides that if a Counterparty does not object to the Cure Amount set forth in the Supplemental Contract Notice within six (6) days after mailing of such, the Cure Amount as set forth in the Supplemental Contract Notice would be paid to such Counterparty if the newly identified contract or lease is eventually assumed by Debtors and assigned to the Successful Bidder. If an objection is filed, it must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount (if any) specified by Debtors in the Contract Notice. If an objection is filed, the cure amount agreed to

---

[17] For example, the THP Capstar Offer provides for THP Capstar to pay all Cure Amounts, and such payments will reduce the purchase price, either at closing or post-closing through a post-closing working capital purchase price adjustment.

[18] Under the THP Capstar Offer, THP Capstar is not permitted to expand the list of executory contracts and unexpired leases to be assumed and assigned to THP Capstar; however, THP Capstar is permitted up until the Auction to delete any executory contract or unexpired leases from the schedule of executory contracts and unexpired leases to be assumed.

by Debtors and the Counterparty or set by the Court at the Sale Hearing must be paid to the Counterparty if the executory contract or unexpired lease is assumed and assigned.

       f.     At the hearing on the Sale Motion, the Successful Bidder will provide information concerning the adequate assurance of its future performance under the Assumed Contracts.

## The APA

    150.    Capstar APA is summarized below:[19]

       a.     **Purchased Assets**. Essentially all of Debtors' operating assets and equity in Foreign Affiliates, as set forth with more particularity in § 2.01 of the APA.

       b.     **Excluded Assets**. Excluded Assets, as set forth with more particularity in § 2.02 of the APA, including cash, certain litigation claims, retained copies of records, dormant subsidiaries, letters of credit, certain avoidance actions and a note payable to Debtors by Michael Malone.

       c.     **Assumption of Liabilities**. The only liabilities being assumed are set forth at APA § 2.03. Notable assumed liabilities include cure payments under executory contracts that constitute current liabilities,[20] a portion of the transfer taxes in conjunction with the Proposed Sale, liabilities to be performed after the closing under Assumed Contracts, governmental permits and agreements relating to marketing funds.

---

[19] The THP Capstar APA is hereby incorporated by reference. The description of the APA set forth in this Sale Motion is a summary description only. To the extent the terms of the Sale Motion conflict with the terms of the APA, the APA will control. Capitalized terms used herein that are not otherwise defined herein shall have the same meaning as set forth in the APA

[20] Cure amounts that do not constitute current liabilities will also be paid by THP Capstar, but the purchase price payable at closing will be reduced dollar for dollar by the aggregate of such cure amounts.

d.    **Excluded Liabilities**. "Excluded Liabilities" are set forth in §

2.03 of the APA. Excluded Liabilities generally are defined negatively – all claims against and

liabilities of the Debtors that are not Assumed Liabilities.

e.    **Assignment of Contracts and Leases**. Designated executory

contracts and unexpired leases are required to be assumed and assigned to THP Capstar. The

Assumed Contracts include, *inter alia*, all of Debtors' customer contracts, certain vendor

agreements and certain real property leases.

f.    **Closing**. The closing must occur within 105 days of the Petition

Date.

g.    **Representations and Warranties**. Representations and

warranties are made which are customary in a transaction of this type.

### The Purchase Price Allocation

151.    Debtors' equity interest in the Foreign Affiliates is extremely valuable.

No allocation of purchase price is made in the APA between the business assets of DMX being

acquired, on the one hand, and the equity value of the Foreign Affiliates, on the other hand.

Such an allocation is ultimately necessary for the proper administration of these Chapter 11

Cases because, as indicated, the lien in favor of the Agent on behalf of the Prepetition Secured

Lenders does not extend to the Excluded Equity. All parties' rights with respect to such matters

are preserved.

152.    Debtors are requesting that this Court, *inter alia*, (a) authorize the sale to

the Successful Bidder(s) of the Purchased Assets free and clear of all liens, claims,

encumbrances or other interests pursuant to sections 363(b), (f) and (m) and 365 of the

Bankruptcy Code, with such liens, claims, encumbrances and other interests to attach to the sale proceeds of the Purchased Assets with the same validity, priority and perfection as existed immediately prior to such sale, and (b) approve the assumption and assignment of the Assumed Contracts.

153.    The Debtors also request that the entry of the Proposed Sale Order shall, among other things:

a.    approve and authorize the transactions contemplated in the APA and the Transaction Documents;

b.    provide for and authorize the release by the Debtors of all of their right, title and interest in and to all claims, causes of action, choses in action, rights of recovery or setoff of any kind (including any preference or other avoidance claim) against any Person (ww) who is a Seller Subsidiary, (xx) who is a counterparty to an Assumed Contract, (yy) who holds an Assumed Liability, or (zz) who is an officer, director, employee or agent of any Seller and who is employed by Purchaser or any subsidiary of Purchaser immediately after the Closing; provided, however, that clauses (xx) and (yy) shall not include any claims, causes of action, choses in action, rights of recovery or setoff of any kind (including any preference or other avoidance claim under the Bankruptcy Code) that are unrelated to the applicable Assumed Contract or Assumed Liability;

c.    include specific findings of fact and conclusions of law which, among other things, shall determine that: (i) the Purchased Assets to be acquired by Purchaser under the APA will be purchased in good faith within the meaning of Section 363(m) of the Bankruptcy Code and that Purchaser is entitled to the protections of such Section; (ii) the APA

was negotiated in good faith and from arms-length bargaining positions; (iii) none of the Sellers

or Purchaser has engaged in conduct that would permit the APA or the transactions contemplated

thereby to be voided under Section 363(n) of the Bankruptcy Code; (iv) that the Purchaser is not

a successor to the Sellers or any other Person except for Assumed Liabilities; (v) that the Sellers

timely and properly complied with all notice obligations set forth in the Sale Procedures Order

and the APA; (vi) the amount of the Cure Amounts under each Assumed Contract; (vii) the sale

of the Purchased Assets shall have been conducted pursuant to an auction and that adequate

notice of the opportunity to bid was provided by Sellers; and (viii) the price to be paid for the

Purchased Assets represents the highest or otherwise best offer therefor and constitutes

reasonably equivalent value;

        d.      provide that the sale of the Purchased Assets pursuant to Sections

363(b) and (f) of the Bankruptcy Code including, without limitation, the assignment pursuant to

Section 365 of the Bankruptcy Code of each Seller's right, title and interest in and to those of the

Assumed Contracts shall be free and clear of all claims, Liabilities, Liens, encumbrances and

other interests pursuant to Sections 363(b) and (f) of the Bankruptcy Code, other than Permitted

Liens and Assumed Liabilities, with such liens, claims, encumbrances and other interests to

attach to the sale proceeds of the Purchased Assets with the same validity, priority and perfection

as existed immediately prior to such sale;

        e.      approve and direct (i) the assumption of all Debtor Assumed

Contracts by Sellers as debtors-in-possession; (ii) the assignment of all Assumed Contracts to

Purchaser; and (iii) the cure of any defaults under all Assumed Contracts and the Cure Amounts

therefor and authorize and require payment by the Sellers of all Cure Amounts (except that

portion constituting Assumed Liabilities) on or before the Closing pursuant to Section 365(a), (b), (c), (f) and (k) of the Bankruptcy Code, provided that Cure Amounts which any Seller is obligated to bear and for which the Purchase Price is reduced at Closing shall be paid by Purchaser;

f.       provide that (i) all counterparties to the Assumed Contracts shall have no recourse against Purchaser or the Purchased Assets to satisfy any default by Sellers (other than the Cure Amounts which Purchaser is required to pay hereunder and any other Assumed Liabilities); instead such parties shall look solely to Sellers or the proceeds of sale; and (ii) that all Assumed Contracts shall remain in full force and effect for the benefit of Purchaser notwithstanding any provision in such Assumed Contracts or applicable law that prohibits, restricts or conditions such assignment and transfer or terminates or modifies or permits a party other than the Sellers to terminate or modify such Assumed Contracts on account of such assignment and transfer;

g.       provide that, except to the extent provided in the APA, Purchaser shall have no liability or responsibility for any claim against or Liabilities of Sellers, any Affiliate of any Seller or any insider of any Sellers or any Lien, other than the Assumed Liabilities and Permitted Liens;

h.       provide for a permanent injunction against the holder of any claims, Liabilities or Liens with respect to assertion of such claims, Liabilities or Liens against the Purchased Assets or Purchaser except for the Assumed Liabilities and Permitted Liens;

i.       authorize and direct Sellers (i) to make all payments specified in clauses (i) through (viii) of Section 5.02(b) of the APA as deductions from the Purchase Price at

Closing, and all payments required by Sections 5.04(c), (e) and (f), Section 9.01(a) (subject to a

$100,000 cap of the APA with respect to consideration necessary to obtain Required Consents)

and 9.01(h), 9.10 and Section 9.11 (subject to a $15,000 cap) of the APA, and (ii) to make all

payments that are required to be made by Sellers under Article XIV of the APA after the Closing

Date solely from the Holdback Amount, and provide that all such payments shall be (x) deemed

allowed administrative expenses of the Sellers' estates under § 503(b) of the Bankruptcy Code

(but in the case of Sellers' payments under Article XIV, limited in recourse to the Holdback

Amount, (y) senior in right of payment to any of Sellers' creditors (including, without limitation,

the Prepetition Secured Lenders and DIP Lenders) and (z) senior in priority to any and all Liens

on the Sellers' property (including, without limitation, Liens of the Prepetition Secured Lender

and the DIP Lenders); provided, however, that the payment of all amounts owing by Sellers

under Article XIV shall be limited in recourse solely to the Holdback Amount, and consequently

shall not be made from any other property of Sellers or proceeds thereof and shall not be senior

in right of payment to, or senior in priority to any Liens of, any of Sellers' creditors with respect

to any property of Sellers other than the Holdback Amount;

    j.  provide that the APA and the transactions and instruments

contemplated hereby shall specifically be performable and enforceable against and binding upon

and shall not be subject to rejection or avoidance by, the Sellers or any chapter 7 or chapter 11

trustee for any Seller or its estate or any other Person acting on behalf of any Seller;

    k.  provide that the Bankruptcy Court shall retain jurisdiction to

enforce the terms and provisions of the Sale Order;

l.    provide that the Successful Bidder and Debtors are authorized to close the Proposed Sale immediately upon entry of the Proposed Sale Order and the Proposed Sale Order is not stayed pursuant to Rule 6004(g) or 6006(d) and;

m.    provide that upon failure to consummate a sale because of a breach or failure on the part of the Successful Bidder(s), the Debtors may select in their business judgment, in consultation with the Agent (and DIP Agent) and Creditors' Committee, the next highest or otherwise best Qualified Bid(s) to be the Successful Bid(s) (as these latter two terms are defined in the Sale Procedures Motion) without further order of the Court.

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the "first day" motions and applications filed concurrently herewith.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of February, 2005.

**MAXIDE ACQUISITION, INC., AEI MUSIC NETWORK, INC., DMX MUSIC, INC., AND TEMPO SOUND, INC.**

By: _____

        Robert Baxter,
        Authorized Representative of the Debtors

Sworn to and subscribed before me
this _14th_ day of February, 2005

_____
        Notary Public

My Commission Expires: _03-21-06_
        (SEAL)